UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

JAQUAN WALTERS,
  a/k/a "Zel,"

                       Defendant.

15 Cr. 644 (AJN)


## THE GOVERNMENT'S MEMORANDUM IN OPPOSITION TO
## THE DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE


AUDREY STRAUSS
Acting United States Attorney
Southern District of New York


Matthew Laroche
*Assistant United States Attorney*
   *Of Counsel*

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ........................................................................................1

BACKGROUND .........................................................................................................3

     A.     The Defendant's Offense Conduct and Trial ................................................3
     B.     The Court's Post-Trial Findings ...................................................................5
     C.     The Defendant's Sentencing ........................................................................7
     D.     The Defendant's Health ................................................................................8
     E.     Federal Correctional Institution Gilmer.....................................................10

DISCUSSION ...........................................................................................................10

I.      THE DEFENDANT HAS NOT ESTABLISHED AN EXTRAORDINARY
       AND COMPELLING REASON FOR COMPASSIONATE RELEASE .............11

II.     THE SECTION 3553(A) FACTORS STRONGLY COUNSEL
       AGAINST THE DEFENDANT'S IMMEDIATE RELEASE .............................16

III.    THE DEFENDANT'S ARGUMENTS WITH RESPECT TO THE
       SENTENCING FACTORS ARE WITHOUT MERIT ........................................21

CONCLUSION..........................................................................................................25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

JAQUAN WALTERS,
    a/k/a "Zel,"

                                    Defendant.

15 Cr. 644 (AJN)

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in opposition to Jaquan Walters's motion seeking compassionate release.  (Dkt. 120 ("Mot.")).  On August 26, 2015, Walters viciously murdered Lamar Moorer—one of Walters's friends—over a $10 bag of marijuana.  On the day of the killing, Walters fought Moorer on a busy public sidewalk because Moorer failed to pay Walters for marijuana.  When the fight ended, Walters left the scene to retrieve a loaded firearm and then returned minutes later.  At the time, Moorer was unarmed and walking on the sidewalk.  Despite posing absolutely no threat to Walters, and despite the fact that children had been playing on the sidewalk in Walters's presence minutes earlier, Walters approached Moorer and executed him—shooting Moorer several times from near point-blank range and then several more times while Moorer was flailing in pain on the ground.  The Court described Walters's crime as a "truly horrific murder" and sentenced him to 25-years' imprisonment.

Now, having served just over five years of that sentence, Walters seeks his immediate release based principally on considerations related to COVID-19.  There is no dispute that COVID-19 is exceptionally serious and has presented significant challenges to the Bureau of Prisons ("BOP").  Earlier today, the Government learned that the number of COVID-19 positive inmates at Federal Correctional Institution ("FCI") Gilmer, where Walters is currently incarcerated, has

risen to approximately 75.  The Government understands that FCI Gilmer has followed all BOP protocols to control the spread of the infection.

While the recent increase in COVID-19 cases at FCI Gilmer is concerning, Walters has not demonstrated an extraordinary and compelling reason justifying his immediate release on the current record.  More critically, granting Walters's requested relief would be entirely inconsistent with the Section 3553(a) factors—it would not appropriately reflect the nature and circumstances of his grave offense, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public from further crimes of the defendant.  *See United States v. Roney*, No. 20-1834, 2020 WL 6387844, at *2 (2d Cir. Nov. 2, 2020) ("courts regularly consider whether compassionate release would be consistent with § 3553(a) by considering how early release would impact the aims of the original sentence.").  Based on these sentencing factors, this Court has repeatedly denied compassionate release motions by defendants convicted of far less serious conduct who were seeking significantly shorter sentence reductions.  *See, e.g.*, *United States v. Cook*, No. 13 Cr. 777 (AJN), 2020 WL 7248973, at *2 (S.D.N.Y. Dec. 9, 2020) (denying motion by defendant who had served 84 months of a 240-month sentence for distributing narcotics, possessing firearms, and planning a violent robbery, because such a significant sentence reduction "would cut strongly against the Court's stated purpose of promoting respect for the law, providing a just punishment, and deterring Mr. Cook and others from engaging in this type of behavior in the future"); *see also infra* p. 20 (collecting cases).  For these reasons and those set forth below, the Government respectfully submits that Walters's motion should be denied.

## BACKGROUND

### A.    The Defendant's Offense Conduct and Trial

On September 21, 2015, Walters was charged in a two-count Indictment with distributing marijuana, in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(D), and intentionally killing Moorer with a firearm, in relation to his drug-trafficking offense, in violation of 18 U.S.C. § 924(j)(1).  A bench trial took place over four days in April and May of 2017.  On May 25, 2017, the Court found Walters guilty on both counts of the Indictment.  Pursuant to Rule 23(c) of the Federal Rules of Criminal Procedure, the Court made specific findings of fact as to each count. (Trial Tr. 467-85, Exhibit A).[1]  Thus, the Court is intimately familiar with the facts of this case, which are summarized below:

On the day of the killing, Walters was selling marijuana on a sidewalk in the vicinity of 262 East Burnside Avenue in the Bronx.  (Stipulation ¶ 13(a)).  During the early afternoon that day, Moorer approached Walters, who was on his bicycle, to ask for marijuana.  (Stipulation ¶ 13(b); GX 501-T at 3:14-25).  Around this time, there were numerous individuals, including young children, walking and playing near Walters.  Walters provided $10 worth of marijuana to Moorer who, in turn, refused to pay.  (Stipulation ¶ 13(b), GX 501-T at 9:4-12).

A fistfight ensued because, as Walters would later admit, Walters was upset that Moorer did not pay for the marijuana and tried to punch him:  "I was just was standing up for what he was taking from me. . . . I can't let him take that."  (GX 501-T at 9:19-22).  After the fight was over, Walters left the scene on his bicycle and went directly to a building about a quarter of a mile from

---

[1] "Trial Tr." refers to the trial transcript, a portion of which is attached as Exhibit A; "GX" refers to Government exhibits admitted at trial; "Stipulation" refers to the parties' trial stipulation admitting certain evidence and testimony; "PSR" refers to the Presentence Investigation Report prepared by the Probation Office.

262 East Burnside Avenue.  (GX 501-T at 5:7-12; Stipulation ¶ 13(c)).  At that building, Walters retrieved a loaded firearm—a defaced, .380 caliber, semi-automatic handgun—that Walters had "stashed on the roof " in a shoebox.  (GX 501-T at 10:15-16; 12:1-9; 22:5-8; Stipulation ¶ 13(c)).

More than six minutes elapsed from when Walters left 262 East Burnside Avenue to when he returned.  (Stipulation ¶ 8).  Upon his return, Walters slowly rode his bicycle along the sidewalk of East Burnside Avenue with a towel in his mouth, which covered part of his face, and with the shoebox in a bag in one of his hands.  (*Id.*).  As Walters approached Moorer on the sidewalk, Moorer appeared to be on his phone and walking on the sidewalk, and there were other civilians standing on the sidewalk.  Walters then rode the bicycle from the sidewalk onto the street between two parked cars, got off of his bicycle on the street, and walked to the sidewalk while removing the firearm from the plastic bag inside of the shoebox.  (GX 501-T at 13-16).  When Walters was approximately five feet from Moorer, Moorer stopped, apparently recognizing Walters for the first time.  (*Id.*).  Walters, who still had the towel in his mouth covering part of his face, immediately fired several shots while moving towards Moorer, the last of which was fired at near point-blank range.  (Stipulation ¶¶ 8, 13(d), (f); GX 501-T at 7:11-12).

Moorer was struck by several bullets and immediately fell to the ground.  (Stipulation ¶ 8).  Walters then aimed at Moorer on the ground and fired additional shots from a few feet away, several of which appeared to strike Moorer.  (*Id.*; Tr. 38:1-6).  Walters then calmly walked between two cars onto the street and used the towel in his mouth to wipe down a car "where his hand had been."  (Trial Tr. 38:7-12).  Walters then returned to where he left the shoebox, which was only a few feet away from where Moorer was flailing in pain, put the gun back in the box, and then rode away on the bicycle.  (Stipulation ¶ 8; Trial Tr. 38:11-12; 74:12-19).  Following the shooting, Walters acted with "no remorse" and he "walked," "[h]e didn't run."  (Trial Tr. 38:11-13).  Moorer

4

was unconscious when members of the New York City Police Department arrived several minutes after the shooting. (Stipulation ¶¶ 1, 8).  Moorer died shortly thereafter from three gunshot wounds to the torso.  (Stipulation ¶ 2-3).

### B.      The Court's Post-Trial Findings

The Court's post-trial decision is relevant to the instant motion in several ways:

*First*, the Court concluded beyond a reasonable doubt that Walters acted with malice.  (Ex. A at 469).  The evidence supporting this finding included: (i) Walters clear motive for the killing to retaliate against Moorer for failing to pay for marijuana and for fighting with Walters (*id.* at 473); (ii) Walters's conduct after the fistfight, including leaving the scene to obtain a firearm and then immediately returning with the firearm to confront Moorer (*id.* at 469); (iii) the "execution style" killing, which included Walters firing at least five shots at point blank range, two of which were fired when Moorer was on the ground flailing in pain (*id.*); and (iv) Walters's conduct after the shooting, including that he calmly left the scene on his bicycle and then shortly thereafter discarded the firearm and his bicycle to hide evidence (*id.* at 472-73).

*Second*, the Court was "not convinced that Mr. Walters actually suffers from PTSD" and stated that there was "not evidence in the record" that his alleged PTSD or a stress-related disorder influenced his behavior or mental state at the time of the killing.  (Ex. A, at 475).  In making this determination, the Court relied on the opinion of Dr. Paradis, who determined that (i) the defendant does not have PTSD principally because he failed to meet the diagnostic criterion for defense avoidance; and (ii) at the time of the offense, Walters "retained the ability for rational thought, decision-making," and he "certainly understood the consequences of what he was doing."  (Trial Tr. 135:16-22; 136:20-25).  The Court found "Dr. Paradis's testimony far more persuasive than [the defendant's expert]. . . . Dr. Paradis's approach to analyzing Mr. Walters was plainly more

thorough, probing, and pertinent." (Ex. A, at 476-77). The Court also stated that "there was a substantial amount of evidence suggesting that Mr. Walters lacked avoidance, a main criterion for a PTSD diagnosis." (*Id.* at 478). For example, Walters "did not avoid real-life situations that would remind him" of prior times he had been shot, which were the purported triggers of his PTSD. (*Id.*). Among other things, Walters continued to live in the area where he was shot and continued to associate with Moorer, who Walters knew to be a violent person and gang member. (*Id.*). Notably, although the Court concluded that there was not enough evidence to conclude that Walters suffered from PTSD, the Court "recognize[d] . . . that both experts agreed that Mr. Walters does suffer from some sort of trauma related disorder." (*Id.* at 479).

*Finally*, the Court concluded that even if Walters suffered from a trauma-related disorder like PTSD, "the evidence here establishes beyond a reasonable doubt that any such disorder did not affect his mental state so greatly as to mitigate his crime from murder to manslaughter." (Ex. A, at 479). In particular, the Court focused on the following facts to support its conclusion that Walters "knew what he was doing when he went to retrieve the gun and returned to the scene of the fistfight, where he killed Mr. Moorer execution style with malice aforethought": (i) Walters "was frequently the instigator or aggressor during the fight," which "undermines his claim that he believed he needed to defend [himself] with deadly force" (Ex. A, at 480); (ii) Walters chose to return to the scene after escaping and "he almost immediately and without provocation shot Mr. Moorer" (*id.* at 480-81); (iii) Walters admitted in his post-arrest statement to hiding the gun and his bike after the murder, which demonstrates that he was "a rational and arguably calculating man rather than someone who genuinely feared for his life" (*id.* at 481); (iv) the video of the murder shows Walters shooting Moorer "execution style" without any provocation whatsoever (*id.* at 481-82); and (v) Walters's statements that he was "standing up for what [Moorer] was taking from me"

6

show that "the true motivation behind the killing was retaliation for Mr. Moorer's failure to pay Mr. Walters for marijuana" (*id.* at 482-83).[2]

## C.     The Defendant's Sentencing

On November 28, 2017, Walters appeared for sentencing.  With respect to the Guidelines calculation, the Court determined that Walters "actions were premeditated and deliberate and, therefore, constitute first-degree murder." (Sent. Tr. 15, Ex. B).  The Court based this conclusion on the factors that informed its trial finding that Walters acted with malice.  (*Id.* at 16-18).  The Court also determined that "under the very unique circumstances of this case," Walters was entitled to a two-point reduction for acceptance of responsibility even though he had "put the government to its burden at trial on the question of *mens rea*." (*Id.* at 18).  Based on those findings, the Court determined that Walters's offense level was 41, his Criminal History Category was I, and the resulting Guidelines range was 324 to 405 months' imprisonment.  (*Id.* at 20).

Moorer's sister spoke at sentencing.  She described the emotional toll of her brother's "senseless" murder on Moorer's family; questioned why Walters, who grew up with Moorer and spent time at his home, killed him; and said she had to leave the area because of the murder.  (Ex. B, at 28-30).  Walters also spoke at sentencing, and expressed deep regret for his actions and apologized to the Moorer family on several occasions.  (*Id.* at 44-45).

Turning to the statutory sentencing factors, the Court described Walters's conduct as "a callus and deliberate, execution-style murder" that was "truly horrific." (Ex. B, at 46, 48).  The

---

[2] On appeal, the Second Circuit affirmed the defendant's conviction, rejecting his contention that the evidence was insufficient to support that he killed Moorer with malice.  *See United States v. Walters*, No. 17-3972, Dkt. 71 (2d Cir. June 4, 2019).

Court explained that "[d]eliberate first-degree murder is one of the most serious offenses that exists"; said a "severe[]" sentence was warranted; and summarized the circumstances of the crime:

> [Walters] did what he did on a public street, crowded with people, including those children you could see playing on the sidewalk soon before the incident. Needless to say, in light of the viciousness of the attack, the murder, the premeditation, the danger, the punishment here and the law here must speak clearly and loudly. The punishment must be sufficient to protect the public, to deter Mr. Walters and others, to reflect the seriousness of this grave offense, to promote respect for the law, and provide just punishment.

(*Id.* at 46-47).

The Court recognized, as did the Government, that there was meaningful mitigation in this case including that: (i) Walters had a minimal criminal history, which demonstrated to the Court that Walters's conduct "was out of character . . . and was aberrational" (Ex. B, at 47); (ii) Walters accepted responsibility for his conduct and was "genuinely remorseful" (*id.*); (iii) Walters took steps toward rehabilitation, including participating in a number of educational programs (*id.* at 47-48); (iv) Walters might have been threatened by Moorer during the fight that preceded the murder (*id.* at 48); and (v) Walters "had an exceedingly difficult upbringing" (*id.*).

Consistent with these observations, the Court sentenced Walters principally to 300 months' imprisonment, a downward variance of 24 months from the Guidelines range. (Ex. B, at 50).

### D. The Defendant's Health

Walters's pre-incarceration medical records reflect that Walters has asthma and was periodically prescribed, though he did not regularly use, ███████ (Def. Ex. B at *passim*; *see also* PSR ¶ 54). Since his incarceration, BOP medical staff has effectively monitored and treated Walters's asthma, which Walters has stated is ███████████. (Def. Ex. C ███████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████

BOP medical staff have changed Walters's treatment plan in response to changes in his asthma symptoms.  For example, ███████████████████████████████████████████ ████████████████████████████████████████████ (Def. Ex. C at 67).  As a result, medical staff prescribed another medication in addition to his ████████████.  (*Id.* at 68). Walters responded well to the new treatment plan.  On February 11, 2020, Walters reported that he was █████████████████████████████████████████████████████ █████████████████████████████████ (*Id.* at 72).

Walters also submitted a declaration with his motion in which he states, among other things, that about a year ago he began experiencing ████████████████████████████ █████████████████████████████████████████████████████ ████████████████████████████████ (Def. Ex. D ¶¶ 3, 4).  ████████████████████████ █████████████████████████████████████████████████████ ██████████████████████ (*Id.* ¶ 4).  ██████████████████████████████ █████████████████████████████████████████████████████ ████████████████████████████████████████

BOP medical records also assess that Walters has PTSD for which he is prescribed medication.  (Def. Ex. C at 27).  BOP medical staff diagnosed Walters with PTSD in September

9

2015 and that diagnosis was the subject of extensive litigation at trial.  While Walters states in his declaration that he ███████████████████████████████" (Def. Ex. D ¶ 5), he did not appear to make those complaints to medical staff in 2019 or 2020.  For example, (i) on February 12, 2019, Walters reported ███████████████████████████████████████████████ (Def. Ex. C at 62); (ii) on August 1, 2019, Walters reported ████████████████ ████████████████████████████ (*id.* at 67); and on February 11, 2020, medical staff recorded ██ ██████████████████████████████████████████████████████ ████████████████████████ (*id.* at 72).

### E.      Federal Correctional Institution Gilmer

Walters has been incarcerated since his surrender on September 22, 2015, and he is currently at FCI Gilmer, a facility with approximately 1,700 inmates.  As described below, FCI Gilmer has implemented BOP's Action Plan for COVID-19.  Earlier today, the Government learned that the number of COVID-19 positive inmates at FCI Gilmer has risen to approximately 75.  As a result of the rise in cases, which began on or about December 29, 2020, FCI Gilmer instituted a lockdown to limit inmate movement.  Beginning tomorrow, and consistent with BOP's Action Plan in light of current conditions, FCI Gilmer will begin allowing small groups of inmates to work in food service and laundry.

### DISCUSSION

Walters's motion fails for two independent reasons.[3]  First, he has not established "extraordinary and compelling reasons" warranting compassionate release under Section

---

[3] The Court has recently set forth and applied the relevant legal standards. *See United States v. Rodriguez*, No. 16 Cr. 07 (AJN), 2020 WL 7640539, at *2 (S.D.N.Y. Dec. 23, 2020) ("The First Step Act grants district courts 'broad' discretion to consider 'the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for

3582(c)(1)(A)(i).   Second, the balance of the Section 3553(a) factors outweighs Walters's arguments for a time-served sentence.  *See, e.g.*, *United States v. Al Kassar*, No. 07 Cr. 354 (JSR), 2020 WL 4813199, at *2 (S.D.N.Y. Aug. 19, 2020) (denying motion for compassionate release though the defendant's age and health problems "constitute the kind of 'extraordinary and compelling circumstances' that could justify compassionate release" because "'almost all' the § 3553(a) factors counsel against a sentence reduction" (citation omitted)).

## I.      THE DEFENDANT HAS NOT ESTABLISHED AN EXTRAORDINARY AND COMPELLING REASON FOR COMPASSIONATE RELEASE

Walters argues that his asthma, the conditions of his confinement, and his alleged PTSD establish an extraordinary and compelling reason justifying his immediate release.  He is incorrect.

The Government acknowledges that Walters's asthma is his strongest argument for showing an extraordinary and compelling circumstance.  The Centers for Disease Control and Prevention ("CDC") has identified "moderate to severe" asthma as a condition that "may" increase the likelihood of severe illness from COVID-19.[4]  As Walters fairly points out, some courts have found that moderate to severe asthma during the COVID-19 pandemic is an extraordinary and compelling circumstance.  (Mot. at 9-10 (citing cases)).  On at least two occasions, this Court has suggested the same.  *See, e.g.*, *United States v. Hernandez*, No. 16 Cr. 717 (AJN), 2020 WL 6269351, at *2 (S.D.N.Y. Oct. 26, 2020) (determining "that Mr. Hernandez's [asthma] is an

---

compassionate release.'" (quoting *United States v. Brooker*, 976 F.3d 228, 237 (2d Cir. 2020)).  The Government does not contend that Walters failed to exhaust his administrative remedies and, in any event, this Court has found that the exhaustion requirement is waivable where, as here, release is sought based on the risk posed by COVID-19.  *See United States v. Scparta*, No. 18 Cr. 578 (AJN), 2020 WL 1910481, at *8 (S.D.N.Y. Apr. 20, 2020).

[4] *See* People With Moderate to Severe Asthma, Centers for Disease Control and Prevention, *available   at*   https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html (last visited on Jan. 1, 2021).

'extraordinary and compelling' circumstance for the purposes of compassionate release," though not considering the Government's arguments to the contrary because compassionate release was inappropriate in light of the sentencing factors ); *United States v. Martinez*, No. 12 Cr. 862 (AJN), 2020 WL 2079542, at *2 (S.D.N.Y. Apr. 30, 2020) ("accept[ing] that Mr. Martinez faces a heightened risk due to his asthma," but denying the motion because of the sentencing factors).

The foregoing authority lends support to Walters's position.  However, based on the specific circumstances of this case, the Government respectfully submits that Walters has not demonstrated an extraordinary and compelling circumstance.  *United States v. Cooper*, No. 16 Cr. 567 (JSR), 2020 WL 4937477, at *2 (S.D.N.Y. Aug. 24, 2020) ("Compassionate release motions require a case-by-case inquiry.").  Walters is a healthy, 29-year old and thus, he is generally at low risk from the disease.[5]  While moderate to severe asthma may place individuals at a higher risk of severe illness from COVID-19, the evidence on this question is "mixed," meaning that "multiple studies . . . reached different conclusions about risk associated" with asthma.[6]  Moreover, while the severity of Walters's asthma fluctuates and the frequency of his use of ███ varies (*see generally* Def. Exs. B and C), he has generally been able to manage his condition with his ███ and it does not appear that he has ever been hospitalized or intubated on account of his asthma. Furthermore, BOP has effectively monitored and treated his condition, and modified his treatment plan to respond to changing symptoms as necessary.  (Def. Ex. C at 15, 26, 44, 57, 62).  "These facts weigh against a finding of 'extraordinary and compelling' reasons."  *United States v.*

---

[5] *See* Older Adults, CDC, *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last visited on January 1, 2021).

[6] *See* Evidence used to update the list of underlying medical conditions that increase a person's risk of severe illness from COVID-19, CDC, *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/evidence-table.html (last visited January 1, 2021).

*Pomales*, No. 16 Cr. 826 (LTS), 2020 WL 4677596, at *2 (S.D.N.Y. Aug. 12, 2020) (finding that the defendant's asthma did not amount to an extraordinary and compelling circumstance where his asthma was being monitored and treated); *see also United States v. Christie*, No. 15 Cr. 288 (RMB), 2020 WL 3969962, at *2 (S.D.N.Y. July 14, 2020) ("'Although [Christie] has been diagnosed with asthma, his medical records . . . demonstrate that his asthma is well-controlled . . . [a]ccordingly, [Christie] has not carried his burden of demonstrating 'extraordinary and compelling reasons' justifying release.'" (quoting *United States v. Frazier*, No. 90 Cr. 913 (LAP), 2020 WL 3508261, at *2 (S.D.N.Y. June 29, 2020)); *United States v. Alvarez*, No. 11 Cr. 169 (VB), 2020 WL 3640523, at *2 (S.D.N.Y. July 6, 2020) ("Alvarez points to other cases in which courts in this district have found 'extraordinary and compelling' circumstances warranting release based upon a respiratory ailment like asthma. . . . However, every case is unique, and the comparison to these cases fails to persuade.").

Walters also fairly points out that FCI Gilmer has had an increase in COVID-19 cases. (Mot. at 10-11).  As noted, FCI Gilmer reported that 75 inmates—or about 4% of the inmate population—currently have COVID-19.  This is certainly a concerning increase, but it does not reflect an "extreme" or "drastic outbreak" nor has Walters presented evidence that "the facility is unable to effectively mitigate Mr. Walters' risk of contracting COVID-19."  (Mot. at 1, 10). Rather, BOP generally, and FCI Gilmer specifically, are actively managing the risks presented by COVID-19.  Starting in January 2020, the BOP implemented an Action Plan for COVID-19.[7]  The BOP continues to revise and update that Action Plan in response to the fluid nature of the COVID-19 pandemic, and in response to the latest guidance from experts at the World Health Organization

---

[7] *See* https://www.bop.gov/coronavirus/overview.jsp#bop_covid-19_response.

("WHO"), the CDC, and the Office of Personnel Management.  In addition, BOP stood up an "agency task force" to study and coordinate its response to COVID-19, including using "subject-matter experts both internal and external to the agency including guidance and directives from the WHO, the CDC, the Office of Personnel Management, Department of Justice, and the Office of the Vice President."  BOP's current Action Plan, which FCI Gilmer has implemented, includes numerous measures designed to protect inmates and staff from the coronavirus pandemic.[8]  These and other steps show that the BOP is meaningfully addressing the risk posed by COVID-19 to inmates, and that it has taken the threat seriously, has mitigated it, and continues to update policies and procedures in accord with the facts and recommendations, as well as directives from the Attorney General.

Relatedly, the Government recognizes that the pandemic has in some circumstances made inmates' incarceration "harsher and more punitive than would otherwise have been the case . . . because the federal prisons . . . have had to impose onerous lockdowns and restrictions that have made the incarceration of prisoners far harsher than normal."  *United States v. Rodriguez*, No. 00 Cr. 761 (JSR), 2020 WL 5810161, at *3 (S.D.N.Y. Sept. 30, 2020) (internal quotation marks and citation omitted).  Walters, like other inmates, has been subject to lockdowns at FCI Gilmer in an effort to prevent the spread of COVID-19 within that facility.  However, on the current record, Walters has not demonstrated that his incarceration has been substantially harsher because of COVID-19.  *See United States v. Pinto-Thomaz*, 454 F. Supp. 3d 327, 331 (S.D.N.Y. 2020) ("[A]s stated by the Court during oral argument on the instant motions, lockdowns are a routine fact of life for incarcerated defendants and are hardly extraordinary.").

---

[8] *See* https://www.bop.gov/coronavirus/covid19_status.jsp.

Finally, for all the reasons cited by the Court in its post-trial opinion, Walters does not suffer from PTSD. (Ex. A, at 475-79). This conclusion is bolstered by Walters's recent BOP medical records, which reflect that Walters has not reported any symptoms associated with his alleged PTSD.[9] (Def. Ex. C at 62, 67-68, 72). This Court has "recognize[d], however, that both [trial] experts agreed that Mr. Walters does suffer from some sort of trauma related disorder." (Ex. A, at 479). Regardless, the CDC does not identify PTSD or any related disorder as a condition that might increase the likelihood of severe illness from COVID-19. It is true, as Walters points out, that one Court in this District found that a defendant's PTSD was an extraordinary and compelling reason justifying compassionate release. (Mot. at 11-12 (citing *United States v. Pina*, No. 18 Cr. 179 (JSR), 2020 WL 3545514, at *1 (S.D.N.Y. June 29, 2020)). In that case, Pina reported PTSD symptoms since the age of five when he witnessed his father being brutally stabbed to death, and in prison, Pina reported symptoms of flashbacks, nightmares, and insomnia. *Pina*, 2020 WL 3545514, at *1. The circumstances here are starkly different. As noted, Walters does not exhibit avoidance, a key criterion for a PTSD diagnosis and, in any event, he has not reported PTSD symptoms to medical staff in some time. Putting that aside, Pina had served 20 months of a 39-month sentence for conspiracy to commit access device fraud and aggravated identity theft, whereas Walters has 20 years remaining for committing a brutal murder. Thus, even if Walters's trauma-related disorder was causing symptoms similar to Pina's, the balancing of the Section 3553(a) factors is markedly different in both cases, as detailed in the following section.

---

[9] Walters states in his declaration that his conditions of confinement and fear of COVID-19 "has made [his] PTSD symptoms worse." (Def. Ex. D ¶ 9). Walters's medical records do not reflect that he reported those symptoms to medical staff at FCI Gilmer.

## II.   THE SECTION 3553(A) FACTORS STRONGLY COUNSEL AGAINST THE DEFENDANT'S IMMEDIATE RELEASE

The Section 3553(a) factors do not support converting Walters's 25-year sentence to a five-year term of imprisonment or home confinement.  To be sure, Walters's history and characteristics lend some support to his motion in light of his minimal criminal history, prison record, and efforts at rehabilitation.  *See infra* Part III.  But this sentencing factor is substantially outweighed by the combined force of several other factors including the nature and circumstances of the offense (18 U.S.C. § 3553(a)(1)); the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant (§ 3553(a)(2)(A)-(C)); and the need to avoid unwarranted sentence disparities (§ 3553(a)(6)).

*First*, the nature and circumstances of this offense are shocking and could hardly be more serious.  Walters premeditated a "truly horrific murder."  (Ex. B at 48).  Furious that Moorer did not pay him for marijuana, Walters stalked Moorer, pulled out his firearm, and shot Moorer numerous times in the chest and then continued shooting him while he was on the ground flailing in pain.  Walters then calmly left the scene, showing no remorse for his actions.  Walters showed absolutely no regard for Moorer's life—someone Walters once considered a friend.  Even more troubling is that Walters decided to shoot Moorer on a public sidewalk in the daytime.  The video of the incident clearly shows numerous pedestrians on the street, including young children who were playing.  (*Id.* at 46 ("[h]e did what he did on a public street, crowded with people, including those children you could see playing on the sidewalk soon before the incident")).  Walters could have shot and killed any number of other innocent people, and he showed complete disregard for their lives during his disgraceful conduct.

16

As the Court concluded, Walters deserved to be punished "severely" for this "execution-style murder." (Ex. B, at 46-47; *see also id.* at 49 ("I am firmly convinced that a serious and severe sentence is both warranted and necessary.")). The premeditation of the attack, the viciousness of the shooting, the desire to inflict injury on Moorer for a senseless reason, and the disregard for the lives of others are all factors that justified the Court's 25-year sentence. Walters's conduct has forever impacted the lives of Moorer's family. As Moorer's sister explained at sentencing, Walters caused immense and immeasurable pain to the family, who will never see Moorer again. The Government recently consulted with Moorer's family who strongly oppose Walters's motion. *See, e.g.*, *United States v. Gileno*, No. 19 Cr. 161 (VAB), 2020 WL 1916773, at *5 (D. Conn. Apr. 20, 2020) (considering the victim's view in granting an application for compassionate release).

*Second*, Walters's request for a time-served sentence would not reflect the seriousness of the offense, promote respect for the law, provide just punishment, or afford adequate deterrence to criminal conduct. 18 U.S.C. § 3553(a)(2)(A)-(B). The Court's 300-month sentence was necessary to achieve those goals. (Ex. B, at 46-47). In particular, the Court explained that a failure to "punish Mr. Walters severely . . . will only allow a continuation of the violence and lawlessness and trauma that Mr. Walters himself has experienced throughout his life." (*Id.* at 47). Reducing Walters's sentence by 80% would disserve those important § 3553(a) factors.

*Third*, the Court must also consider whether Walters is "a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2); *see also* 18 U.S.C. § 3553(a)(2)(C); *United States v. Hernandez*, No. 16 Cr. 717 (AJN), 2020 WL 6269351, at *2 (S.D.N.Y. Oct. 26, 2020). In turn, Section 18 U.S.C. § 3142(g) directs the Court to consider (i) the nature and circumstances of the offense; (ii) the weight of the evidence; (iii) the history and characteristics of the defendant; and (iv) the nature and seriousness of the danger to any person or

the community that would be posed by the defendant's release.  For the reasons described above, the first and second factors counsel heavily in favor of Walters's continued detention at this time. Walters committed a brutal murder, and the Court determined that a 300-month sentence was necessary "to protect the public" and "to deter Mr. Walters."  (Ex. B, at 46).  Releasing Walters now, just over five years into that sentence, would not ensure the public's safety.  Walters's alleged PTSD and release plan raise additional public safety concerns.  Walters continues to assert that he suffers from PTSD and that his PTSD might have been a significant contributing factor to his criminal conduct.  *See generally Walters v. United States*, No. 20 Civ. 10763 (AJN) (S.D.N.Y.). Walters also proposes to live in the Bronx in the general vicinity of his purported PTSD triggers that he contends contributed to him murdering Moorer.  The Government acknowledges that Walters's minimal criminal history and meaningful efforts to rehabilitate himself are to his benefit. (Ex. B, at 47 (noting that Walters's conduct "was out of character" and "aberrational")).  But those considerations do not outweigh the viciousness of his criminal conduct, the short period of time he has served for his horrific crime, and the concerns raised by his release plan.

*Finally*, granting Walters's motion would create unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct.  18 U.S.C. § 3553(a)(6).  The Government is not aware of any case (and Walters has not cited one) in which a defendant convicted of murder under remotely similar circumstances had his or her sentence reduced on the level requested by Walters.  In fact, courts have consistently denied compassionate release motions brought by defendants convicted of murder or conspiracy to commit murder based on the Section 3553(a) factors.  *See, e.g.*, *United States v. Morris*, No. 11 Cr. 912 (JFK), 2020 WL 6781063, at *4 (S.D.N.Y. Nov. 18, 2020) (denying motion on Section 3553(a) grounds where defendant was convicted of "two serious, violent, and brutal offenses, including the point-blank

murder of a complete stranger"); *United States v. Shakur*, No. 82 Cr. 312 (CSH), 2020 WL 6482875, at \*5-7 (S.D.N.Y. Nov. 2, 2020) (denying motion on Section 3553(a) grounds where defendant was convicted of, among other things, bank robbery murder); *United States v. Rivera*, No. 13 Cr. 424 (KMW), 2020 WL 6151106, at \*2 (S.D.N.Y. Oct. 20, 2020) (denying motion on Section 3553(a) grounds where defendant was convicted of attempted robbery and murder of a drug supplier).

Walters has cited two cases, discussed in additional detail in Part III below, in which defendants who committed murder had their compassionate release motions granted in part. (Mot. at 12 (citing *United States v. Rodriguez*, No. 00 Cr. 761 (JSR), 2020 WL 5810161, at \*5 (S.D.N.Y. Sept. 30, 2020); *United States v. Rios*, No. 94 Cr. 112 (JBA), 2020 WL 7246440, at \*2 (D. Conn. Dec. 8, 2020)). However, in both cases, the defendants' sentences were reduced from life imprisonment to 30-year terms of imprisonment, which is a far cry from the five-year sentence sought by Walters. *See Rodriguez*, 2020 WL 5810161, at \*8; *Rios*, 2020 WL 7246440, at \*6. Granting Walters's motion also would create a substantial and unwarranted sentencing disparity within his own family. Another court in this District recently denied the compassionate release motion of Dashawn Walters—the defendant's brother—who is serving a 115-month sentence for a drug-related shooting. The Court in that case concluded, among other things, that the 49-month sentence reduction sought by Dashawn Walters "would fail to satisfy any of the purposes of sentencing, namely to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant." *United States v. Walters*, No. 16 Cr. 339 (RMB), Dkt. 95, at 7 (S.D.N.Y. Oct. 21, 2020) (internal quotation marks and citation omitted).

That reasoning applies with even greater force here, given the far graver circumstances of Jaquan Walters's crime and the length remaining on his sentence.

At bottom, an analysis of the Section 3553(a) factors do not support the unprecedented relief sought by Walters. This Court has repeatedly denied compassionate release motions by defendants who committed far less serious crimes and requested significantly smaller sentence reductions. The Court should do so again here. *See, e.g.*, *Cook*, 2020 WL 7248973, at *2; *United States v. Burrell*, No. 15 Cr. 95 (AJN), 2020 WL 7646887, at *3 (S.D.N.Y. Dec. 23, 2020) (denying motion by defendant whose "commitment to his education . . . [showed his] rehabilitative potential," because consideration of the other § 3553(a) factors did not justify a close to 10-year sentence reduction for the defendant's participation in a RICO conspiracy); *United States v. Hernandez*, No. 16 Cr. 717 (AJN), 2020 WL 6269351, at *2 (S.D.N.Y. Oct. 26, 2020) (denying motion by defendant who had provided a loaded firearm as part of a plot to rob others and had served over two years of a six year sentence, because "[s]uch a significant reduction in Mr. Hernandez's sentence would not adequately reflect the seriousness of his offense and would not serve the purpose of deterring Mr. Hernandez from recidivating in the future."); *United States v. Rodriguez*, No. 16 Cr. 07 (AJN), 2020 WL 7640539, at *4 (S.D.N.Y. Dec. 23, 2020) (denying motion by defendant who had "served only about half his sentence for multiple acts that gravely imperiled members of the public" because of the § 3553(a) factors); *United States v. Dasilva*, No. 15 Cr. 95 (AJN), 2020 WL 5764286, at *2 (S.D.N.Y. Sept. 28, 2020) (denying motion by defendant who had committed to rehabilitation and had served about one third of a 15-year sentence for discharging firearms in furtherance of racketeering and narcotics conspiracies because "such a drastic reduction of the Defendant's sentence would [not] adequately reflect the seriousness of the offense and promote respect for the law").

### III.   THE DEFENDANT'S ARGUMENTS WITH RESPECT TO THE SENTENCING FACTORS ARE WITHOUT MERIT

Walters does not address his horrific offense conduct in his motion, acknowledging only that he "committed a serious crime." (*See* Mot. at 16). Instead, he makes three arguments with respect to the sentencing factors. First, he cites three cases in which courts have granted compassionate release motions where defendants were convicted of violent offenses. (Mot. at 12 (citing *Rodriguez*, 2020 WL 5810161, at *8; *Rios*, 2020 WL 7246440, at *6; and *United States v. Copeland*, No. 02 Cr. 1120 (FB), 2020 WL 2537250, at *3 (E.D.N.Y. May 19, 2020)).[10] Those cases are inapposite. As an initial matter, Copeland's offense—acting as a "getaway driver in a 2003 bank robbery that saw no one harmed and $3,700 stolen"—is not remotely comparable to Walters's premeditated murder. *Copeland*, 2020 WL 2537250, at *1. Regardless, in each case, a critical consideration was that the defendants had already served substantial prison time— Copeland had served 19 years, Rodriguez had served 20 years, and Rios had served 26 years. As a result, reducing Copeland's sentence to time served and Rodriguez's and Rios's sentences to 30-year terms of imprisonment, was consistent with the Section 3553(a) factors. *See Rodriguez*, 2020 WL 5810161, at *8 ("In short, the Court finds that a 30-year sentence is 'sufficient, but not greater than necessary' to comply with the purposes of the federal sentencing factors."); *Rios*, 2020 WL 7246440, at *6 ("After thorough consideration of the § 3553(a) factors, including deterrence and public safety objectives of sentencing as well as Defendant's health risks, the Court concludes that the interests of justice weigh in favor of granting Mr. Rios compassionate release. Given the

---

[10] The Government also identified *United States v. Gluzman*, No. 96 Cr. 323 (LJL), 2020 WL 4233049, at *19 (S.D.N.Y. July 23, 2020) as a case in which a defendant who committed murder was granted compassionate release. Like the cases cited by Walters, *Gluzman* is distinguishable. The defendant in that case was 71, suffered from several serious medical conditions, and had already served over 24-years of her sentence.

gravity of the offense, the Court follows the Second Circuit's admonishment to 'reduce but not eliminate a defendant's prison sentence,' and thus reduces Defendant's sentence from three terms of life to thirty years." (quoting *Brooker*, 976 F.3d at 237)); *Copeland*, 2020 WL 2537250, at *3-4. Far from supporting Walters, *Copeland*, *Rodriguez*, and *Rios* reinforce that converting his 25-year sentence to a five-year sentence would run roughshod over important sentencing considerations.[11]

*Second*, Walters highlights that he recently filed a habeas motion claiming there is a reasonable probability that he would not have been found to have committed premeditated murder had his attorney provided adequate assistance.  (Mot. at 13).  The Court should reject Walters's invitation to consider the potential consequences of his habeas motion in connection with the instant motion.  The Court will consider the merits of his habeas motion when it is fully briefed.  At this time, however, the record remains that the Court, as the trial fact finder, determined beyond a reasonable doubt that Walters acted with malice and premeditation when he killed Moorer and sentenced him accordingly.  (Ex. B, at 15-16).

*Third*, Walters focuses on his history and characteristics, including his minimal criminal history, prison record, and rehabilitative efforts since his arrest.  (Mot. 13-15).  This is his strongest argument.  Walters has performed admirably in prison and it is reassuring that he has continued to

---

[11] This Court also has granted compassionate release motions in cases where defendants were involved in violent conduct.  The Government respectfully submits that those cases are distinguishable in that the defendants participated in far less serious conduct, served longer portions of their sentences, and/or had more serious medical conditions than Walters.  *See, e.g.*, *United States v. Camper*, No. 13 Cr. 378 (AJN), 2020 WL 7647457, at *1 (S.D.N.Y. Sept. 2, 2020) (granting motion by 54-year old defendant suffering from obesity and sleep apnea who had served over one half of his 188-month sentence for participating in a robbery conspiracy); *United States v. Pena*, 459 F. Supp. 3d 544, 547 (S.D.N.Y. 2020) (granting motion by 60-year old defendant suffering from hypertension who had served over two thirds of his 84-month sentence for organizing, but not participating in, a violent home-invasion robbery).

improve himself.  (*Id.* at 14 (explaining that Walters has no disciplinary record at FCI Gilmer, is pursuing his education, and has completed a number of programs and courses)).  It is also true that Walters's has a minimal criminal history and no past pattern of violent behavior.

But reducing Walters's sentence by 80% based on those considerations would be incommensurate with his crime.  While Walters's prison conduct is commendable, the Court already accounted for at least some of those efforts and his minimal criminal history at sentencing in its downward variance from the Guidelines range.  *See, e.g.*, *United States v. Zubiate*, No. 18 Cr. 442 (AJN), 2020 WL 3127881, at *3 (S.D.N.Y. June 12, 2020) ("Defendant's efforts at rehabilitation, which the Court commends and encourages, do not alter the Court's prior weighing of the § 3553(a) factors, because the Court *already* accounted for these efforts at sentencing in its significant variance from the applicable guidelines range." (emphasis in original)).  Walters's more recent rehabilitative efforts are also not so extraordinary to warrant an unprecedented sentence reduction.  For example, in *Rodriguez*, the defendant's rehabilitative efforts were "remarkable" and included an "extraordinary collection of letters—from fellow inmates, family, friends, and, most important, 27 members of the prison staff—[that made] clear that Rodriguez has used his twenty years in prison not just to better himself but also to better his community."  *Rodriguez*, 2020 WL 5810161, at *4.  Even in those circumstances, the Court concluded that a "sentence reduction to time served" would be "an extreme reduction [that] would not reflect the seriousness of, or provide just punishment for, his egregious participation in a brutal murder of a government informant."  *Id.* at *5.  Walters requests far more significant relief based on a much more limited record of rehabilitation and, thus, his request should be denied.

Finally, the Court should not grant Walters's request to convert his sentence to home confinement.  For the same reasons described above, Walters's prison sentence appropriately

balanced the § 3553(a) factors and releasing Walters to home confinement would be inconsistent with those considerations. The case cited by Walters—*United States v. Ramos*, No. 18 Cr. 852 (AT), 2020 WL 6487198, at *1 (S.D.N.Y. Nov. 4, 2020)—does not alter that conclusion. In *Ramos*, the Court granted a defendant's motion to serve on home confinement the remaining 10 months of a 48-month sentence for possessing a defaced firearm. *Id.* at *1, *3. Here, Walters's offense conduct is extraordinarily more serious and his remaining term of imprisonment about 20 times longer than in *Ramos*, and, in any event, it would be entirely impractical to impose a 20-year term of home confinement.

## <u>CONCLUSION</u>

The Court imposed a 300-month prison sentence in this case after careful consideration of Walters's offense conduct and the Section 3553(a) factors.  The sentence appropriately reflected the extraordinary seriousness of Walters's criminal conduct and his personal history and characteristics.  Reducing that sentence to time served would not promote respect for the law and is not supported by the Section 3553(a) factors.  Accordingly, even if Walters could demonstrate extraordinary and compelling circumstances, his motion should be denied.

Dated: New York, New York
       January 5, 2021

                                        Respectfully submitted,

                                        AUDREY STRAUSS
                                        Acting United States Attorney for the
                                        Southern District of New York

                                 By:    ___/s/_____
                                        Matthew Laroche
                                        Assistant United States Attorney
                                        (212) 637-2420

Enclosures

Cc:    Defense Counsel
       (Via ECF and Email)