UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

-v.-

JAQUAN WALTERS,
  a/k/a "Zel,"

                    Defendant.

15 Cr. 644 (AJN)

---

## GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO VACATE A SENTENCE PURSUANT TO 28 U.S.C. § 2255

DAMIAN WILLIAMS
United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Andrew Jones
Assistant United States Attorney
*Of Counsel*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS .................................................................................................... 2

    A.  Offense Conduct................................................................................................ 2

    B.  Indictment.......................................................................................................... 4

    C.  Trial .................................................................................................................... 4

    D.  Verdict and the Court's Factual Findings ........................................................ 9

    E.  Sentencing ....................................................................................................... 11

    F.  Petition ............................................................................................................ 12

ARGUMENT .................................................................................................................... 13

  I.  Walters Has Not Established a Valid Claim of Ineffective Assistance of Counsel........... 13

    A.  Legal Standard................................................................................................. 13

    B.  Discussion ....................................................................................................... 14

  II.  A Hearing Is Not Required and No Certificate of Appealability Should Issue ................. 22

CONCLUSION................................................................................................................... 23

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to the motion (the "Petition") filed by Jaquan Walters, through counsel, to vacate his sentence pursuant to Title 28, United States Code, Section 2255. (ECF No. 116; *see also* ECF Nos. 117-18). Walters's argument that he was denied effective assistance of counsel at his trial and sentencing lacks merit. The Petition should be denied without a hearing, and the Court should decline to issue a certificate of appealability.

On May 25, 2017, Walters was convicted, following a bench trial, of possession with the intent to distribute marijuana, in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(D), and 2 ("Count One"), and of murdering Lamar Moorer with a firearm on August 26, 2015, during and in relation to the marijuana trafficking offense charged in Count One, in violation of 18 U.S.C. §§ 924(j)(1) and 2 ("Count Two"). On December 4, 2017, this Court sentenced Walters to a below-Guidelines sentence of 300 months' imprisonment. Walters' conviction and sentence were affirmed on appeal in a summary order.

Walters's Petition followed in December 2020. Walters claims he received ineffective assistance of counsel based on an alleged failure of his attorney to have an expert witness contest his mental state at the time he shot and killed Moorer. In fact, Walters's attorney hired a forensic psychologist who prepared a report and testified at his trial. The expert's report and testimony were the lynchpin of a trial strategy to establish that Walters killed Moorer in the heat of passion or as an act of imperfect self-defense, making the killing manslaughter, not murder. The defendant's strategy failed, not because his attorney was ineffective, but because the cold, calculated nature of the killing—really an execution—could not be explained away by Walters's purported PTSD, as described by his expert witness. The strategy to convince the Court that

Walters lacked the mental state to commit murder failed because of the overwhelming evidence of Walters' guilt, not because of any inherent issue with the strategy itself. Accordingly, the Petition falls far short of the rigorous standard for such claims set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and should be rejected outright.

## STATEMENT OF FACTS

### A.        Offense Conduct

On August 26, 2015, at approximately 1:00 p.m., Walters murdered Lamar Moorer—one of Walters's friends—over a $10 bag of marijuana. On the day of the killing, Walters fought with Moorer on a busy public sidewalk because Moorer failed to pay Walters for the marijuana. When the fistfight ended, Walters left the scene to retrieve a loaded firearm that he kept on the roof of a nearby building. Several minutes later, Walters returned to the scene of the fight on a bicycle with the firearm in a shoebox. At the time, Moorer was unarmed, walking on the sidewalk, and appeared to be talking on his cellphone. Despite posing absolutely no threat to Walters, and despite the fact that children had been playing on the sidewalk in Walters's presence minutes earlier, Walters got off of his bicycle, removed the firearm from the shoebox, approached Moorer, and shot him several times from near point-blank range and then at least twice more while Moorer was flailing in pain on the ground. The evidence introduced at a bench trial in April and May 2017 established the following:

On the day of the killing, Walters was selling marijuana on a sidewalk in the vicinity of 262 East Burnside Avenue in the Bronx. (Stipulation ¶ 13(a)).[1] During the early afternoon that

---

[1] "Tr." refers to the trial transcript; "Sent Tr." refers to the sentencing transcript; "GX" refers to Government exhibits admitted at trial; "Stipulation" refers to the parties' trial stipulation admitting certain evidence and testimony; "ECF No." refers to corresponding docket entries on docket 15 Cr. 644 (AJN).

day, Moorer approached Walters, who was on his bicycle, to ask for marijuana.  (Stipulation ¶ 13(b); GX 501-T at 3:14-25). Around this time, there were numerous individuals, including young children, walking and playing near Walters. Walters provided $10 worth of marijuana to Moorer who, in turn, refused to pay.  (Stipulation ¶ 13(b), GX 501-T at 9:4-12).

A fistfight ensued because, as Walters would later admit, Walters was upset that Moorer did not pay for the marijuana and tried to punch him: "I was just was standing up for what he was taking from me. . . . I can't let him take that." (GX 501-T at 9:19-22). After the fight was over, Walters left the scene on his bicycle and went directly to a building about a quarter of a mile from 262 East Burnside Avenue. (GX 501-T at 5:7-12; Stipulation ¶ 13(c)). At that building, Walters retrieved a loaded firearm—a defaced, .380 caliber, semi-automatic handgun— that Walters had "stashed on the roof" in a shoebox. (GX 501-T at 10:15-16; 12:1-9; 22:5-8; Stipulation ¶ 13(c)).

More than six minutes elapsed from when Walters left 262 East Burnside Avenue to when he returned. (Stipulation ¶ 8). Upon his return, Walters slowly rode his bicycle along the sidewalk of East Burnside Avenue with a towel in his mouth, which covered part of his face, and with the shoebox in a bag in one of his hands. (*Id.*). As Walters approached Moorer on the sidewalk, Moorer appeared to be on his phone and walking on the sidewalk, and there were other civilians standing on the sidewalk. Walters then rode the bicycle from the sidewalk onto the street between two parked cars, got off of his bicycle on the street, and walked to the sidewalk while removing the firearm from the plastic bag inside of the shoebox. (GX 501-T at 13-16). When Walters was approximately five feet from Moorer, Moorer stopped, apparently recognizing Walters for the first time. (*Id.*). Walters, who still had the towel in his mouth

3

covering part of his face, immediately fired several shots while moving towards Moorer, the last of which was fired at near point-blank range. (Stipulation ¶¶ 8, 13(d), (f); GX 501-T at 7:11-12).

Moorer was struck by several bullets and immediately fell to the ground. (Stipulation ¶ 8). Walters then aimed at Moorer on the ground and fired additional shots from a few feet away, several of which appeared to strike Moorer. (*Id.*; Tr. 38:1-6). After shooting Moorer, Walters calmly walked between two cars onto the street and used the towel in his mouth to wipe down a car "where his hand had been." (Tr. 38:7-12). Walters then returned to where he left the shoebox, which was only a few feet away from where Moorer was flailing in pain, put the gun back in the box, and rode away on the bicycle. (Stipulation ¶ 8; Trial Tr. 38:11-12; 74:12-19). Following the shooting, Walters acted with "no remorse," and he "walked"; "[h]e didn't run." (Tr. 38:11-13). Moorer was unconscious when members of the New York City Police Department arrived several minutes after the shooting. (Stipulation ¶¶ 1, 8). Moorer died shortly thereafter from three gunshot wounds to the torso. (Stipulation ¶¶ 2-3).

### B.        Indictment

On September 21, 2015, Walters was indicted by a grand jury in two counts. Count One charged Walters with possession with intent to distribute marijuana, in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(D). Count Two charged Walters with the murder of Lamar Moorer with a firearm during and in relation to the marijuana trafficking offense charged in Count One, in violation of 18 U.S.C. § 924(j)(1). (Indictment, ECF No. 1).

### C.        Trial

In December 2016, the defendant requested a bench trial, and the Court granted the motion. (ECF No. 41; 42.) The trial was held in April and May 2017. Walters did not contest that he intentionally killed Moorer, and at trial, the Court was asked to resolve only a single factual dispute: whether Walters acted with or without malice when he shot and killed Moorer—the

difference between murder, in violation of 18 U.S.C. § 924(j)(1), and a manslaughter, in violation of 18 U.S.C. § 924(j)(2). (ECF No. 42).

The defendant hired Dr. Jessica Pearson, a forensic psychologist, as an expert witness to support his contention that he acted without malice when he killed Moorer. In advance of her testimony, Dr. Pearson prepared a report dated December 30, 2016 (the "Report") and a two-page addendum to the Report dated January 16, 2017 (the "Addendum"). In the Report, Dr. Pearson opined on the "current psychological functioning" of Walters and "address[ed] . . . mitigating factors related to his mental state at the time of the instant offense." (Report at 1). The Report concluded, among other things, that Walters "meets criteria for [PTSD], in partial remission." (Report at 10).

After receiving the Report, the Government requested clarification as to the nature of Dr. Pearson's anticipated testimony at the bench trial. As a result, Dr. Pearson submitted the Addendum, which stated that "during the events of the instant offense, Mr. Walters was experiencing extreme but reasonable fear; his extreme but reasonable fear was based on personal historical factors and the situational factors present at the time of the instant offense." (Addendum at 2). Dr. Pearson explained that Walters's PTSD symptoms led to "hypervigilance, paranoia, hyperstartle response, and increased physiological response to triggers." Dr. Pearson concluded that "[i]t is my clinical opinion that Mr. Walters' history of PTSD in combination with the situational factors present during the altercation with Mr. Moorer contributed to Mr. Walters' perception that he was at risk for severe injury or death at the hands of Mr. Moorer." (*Id.*).

At trial, Dr. Pearson reiterated the opinions set forth in the Report and Addendum. (Tr. 245–317). Dr. Pearson also testified that symptoms of PTSD are not omnipresent, and that

one "would expect that symptoms [of PTSD] will kind of wax and wane depending on situational variables, mood issues, things that are happening, where you are." (Tr. 305:20-22).

In response to Dr. Pearson, the Government offered the expert testimony of Dr. Cheryl Paradis, also a forensic psychologist. Dr. Paradis's testimony differed from Dr. Pearson's in two key respects: First, Dr. Paradis determined that Walters did not have PTSD principally because he failed to meet the diagnostic criterion for defensive avoidance. As Dr. Paradis explained, avoidance is "one of the cardinal symptoms of PTSD" (Tr. 101:1-2) because individuals with PTSD "don't want to re-experience those [traumatic] feelings" (Tr. 140:9-14). However, Walters engaged in numerous activities that were inconsistent with persistent avoidance of his past trauma of having been shot twice on the street. For example, Walters spent virtually every day hanging out and selling marijuana on East Burnside Avenue, which was described by witnesses as a dangerous neighborhood, and Walters associated with Moorer, whom Walters knew to be a violent criminal. (Tr. 127:5-14; 128:2-21).

Second, Dr. Paradis determined that at the time of the murder, Walters "retained the ability for rational thought [and] decision-making," and he "certainly understood the consequences of what he was doing." (Tr. 135:16-22; 136:20-25). In reaching this conclusion, Dr. Paradis focused on Walters's actions and emotions at key times on the day of the killing. At the beginning of the day, Walters was not afraid to sell marijuana to Moorer, a violent person (Tr. 130:2-5), and even after Moorer made a hand gesture like a gun and threatened Walters, he did not immediately leave (Tr. 130:5-11). Dr. Paradis also spent substantial time addressing why Walters came back to the scene of the fight after obtaining a gun. Walters told Dr. Paradis that he did not expect Moorer to be there. However, Dr. Paradis did not credit this response because it was "common sense" that Moorer would remain at that location for a few minutes. (Tr. 128:10-

12; 132:16-19). Moreover, Dr. Paradis would not expect someone with PTSD to come back to the scene of the fight; rather, such a person would "stay hidden in a place where they felt safe." (Tr. 132:4-7).

Dr. Paradis also testified that while Walters denied having feelings of anger, his actions and other statements strongly suggest that he was mad when he returned to the scene. For example, Walters admitted that "you got to stand up for yourself," which "common sense" suggests means "he had at least some feelings of anger." (Tr. 128:21-24, 133:2-9). As Dr. Paradis explained: "Walters knew he had a gun. He knew he was shooting. He knew that it would hurt the victim, and he knew that he wanted to get away, and the best way to get away would be to hide the gun. He knew . . . to get rid of the gun, get rid of the evidence." (Tr. 135:21–136:2).

After receiving evidence over three days, the Court ordered post-trial briefing. In its brief, the Government argued that "the defendant's conduct was malicious, premeditated, cold, calculated, and without any justification whatsoever." (ECF. No. 74 at 4). In particular, the Government noted the defendant's stated motive in the killing was retaliation for the theft of marijuana and that the defendant's actions after the fistfight—retrieving a gun a quarter mile away, returning to the scene of the fight, shooting Moorer five times without provocation, including after he fell to the ground and writhed in pain, and disposing of the weapon—were all strong evidence that he committed a premeditated murder. (ECF No. 74 at 13–16).

The defendant responded that the killing lacked malice. Principally the defendant argued that the killing was committed in the heat of passion, or alternatively, that the defendant killed Moorer in an act of "imperfect" self-defense—that is, that the defendant unreasonably, but sincerely, believed deadly force was necessary to protect himself. (ECF No. 76 at 24–26, 29).

The defendant relied on the Report and testimony of Dr. Pearson in making both arguments that the killing was manslaughter.

To argue that the killing was made in the heat of passion, the defendant relied on Dr. Pearson's testimony that (i) the defendant was aware of Moorer's violent criminal history and his reputation for violence; (ii) the defendant knew Moorer was a gang member with access to guns; (iii) the defendant attempted to deescalate the situation with Moorer; (iv) the defendant acted in a manner consistent with being afraid of Moorer after the fight. (ECF No. 76 at 29–32). The defendant used these statements from his expert, along with other available evidence, to argue that when he killed Moorer, Walters had "had just endured a physical altercation where he was violently assaulted by [Moorer] for no reason at all and his life was threatened" and therefore "was acting under the fear and stress that his life was in imminent harm at the time of the offense." (ECF No. 76 at 34).

The defendant relied even more explicitly on the Report, Addendum, and testimony of Dr. Pearson in making his imperfect self-defense argument. In addition to the elements of Dr. Pearson's testimony described above, for this argument, the defendant relied heavily on a diagnosis of PTSD made by Dr. Pearson. (ECF No. 76 at 34). This diagnosis stemmed from two instances years earlier in which Walters had been shot as a bystander on the street. Critically, in the Addendum to her expert report, and when testifying at trial, Dr. Pearson opined that "Mr. Walters'[s] history of PTSD in combination with the situational factors present during the altercation with Mr. Moorer contributed to Mr. Walters'[s] perception that he was at risk for severe injury or death at the hands of Mr. Moorer." (Addendum 1–2; *see* Tr. 318 ("I think [Walters] believed -- I think he had a true belief that [Moorer] could have [a gun] and that he would shoot him, and his [Walters] – responded by protecting himself in that manner, by

shooting first."); ECF No. 76 at 39). These opinions of Dr. Pearson, if accepted by the Court, would have established the elements of imperfect self-defense and, assuming the Court found the defense legally cognizable, made the killing manslaughter and not murder.

### D.  Verdict and the Court's Factual Findings

The Court found Walters guilty on both counts and, specifically as to Count Two, the murder charge, found that he acted with malice aforethought when he shot and killed Moorer and therefore committed murder in violation of 18 U.S.C. § 924(j)(1). (Tr. 466, 468). The evidence supporting this finding included: (i) Walters's clear motive for the killing to retaliate against Moorer for failing to pay for marijuana and for fighting with Walters (Tr. 473); (ii) Walters's conduct after the fistfight, including leaving the scene to obtain a firearm and then immediately returning with the firearm to confront Moorer (Tr. 469); (iii) the "execution style" killing, which included Walters firing at least five shots at point-blank range, two of which were fired when Moorer was on the ground flailing in pain (Tr. 469); and (iv) Walters's conduct after the shooting, including that he calmly left the scene on his bicycle and then shortly thereafter discarded the firearm and his bicycle to hide evidence (Tr. 472-73).

The Court also noted it was "not convinced that Mr. Walters actually suffers from PTSD" and stated that there was "not evidence in the record" that his alleged PTSD or a stress-related disorder influenced his behavior or mental state at the time of the killing. (Tr. 475). In making this determination, the Court relied on the opinion of Dr. Paradis, who determined that (i) the defendant does not have PTSD principally because he failed to meet the diagnostic criterion for defense avoidance; and (ii) at the time of the offense, Walters "retained the ability for rational thought, decision-making," and he "certainly understood the consequences of what he was doing." (Tr. 135:16-22; 136:20-25). The Court found "Dr. Paradis's testimony far more persuasive than Dr. Pearson's. . . . Dr. Paradis's approach to analyzing Mr. Walters was plainly

more thorough, probing, and pertinent." (Tr. 476-77). The Court also stated that "there was a substantial amount of evidence suggesting that Mr. Walters lacked avoidance, a main criterion for a PTSD diagnosis." (Tr. 478). For example, Walters "did not avoid real-life situations that would remind him" of prior times he had been shot, which were the purported triggers of his PTSD. (Tr. 478). Among other things, Walters continued to live in the area where he was shot and continued to associate with Moorer, who Walters knew to be a violent person and gang member. (Tr. 478). Notably, although the Court concluded that there was not enough evidence to conclude that Walters suffered from PTSD, the Court "recognize[d] . . . that both experts agreed that Mr. Walters does suffer from some sort of trauma related disorder." (Tr. 479).

The Court concluded that even if Walters suffered from a trauma-related disorder like PTSD, "the evidence here establishes beyond a reasonable doubt that any such disorder did not affect his mental state so greatly as to mitigate his crime from murder to manslaughter." (Tr. 479). In particular, the Court focused on the following facts to support its conclusion that Walters "knew what he was doing when he went to retrieve the gun and returned to the scene of the fistfight, where he killed Mr. Moorer execution style with malice aforethought": (i) Walters "was frequently the instigator or aggressor during the fight," which "undermines his claim that he believed he needed to defend [himself] with deadly force" (Tr. 480); (ii) Walters chose to return to the scene after escaping and "he almost immediately and without provocation shot Mr. Moorer" (Tr. 480-81); (iii) Walters admitted in his post-arrest statement to hiding the gun and his bike after the murder, which demonstrates that he was "a rational and arguably calculating man rather than someone who genuinely feared for his life" (Tr. 481); (iv) the video of the murder shows Walters shooting Moorer "execution style" without any provocation whatsoever (Tr. 481-82); and (v) Walters's statements that he was "standing up for what [Moorer] was taking from

10

me" show that "the true motivation behind the killing was retaliation for Mr. Moorer's failure to pay Mr. Walters for marijuana" (Tr. 482-83).

### E. Sentencing

In November 2017, Walters appeared before the Court for sentencing. A disputed issue relevant to the Guidelines calculation was whether the murder was premeditated. At the conclusion of the trial six months earlier, the Court had noted it was "inclined to find, based on essentially the same facts discussed [in reaching a verdict], that the killing was premeditated," but that the issue would not be decided until sentencing. (Tr. 485). At sentencing the Court determined that Walters's "actions were premeditated and deliberate and, therefore, constitute first-degree murder." (Sent. Tr. 15). The Court based this conclusion on the factors that informed its trial finding that Walters acted with malice: (i) Walters's retaliatory motive; (ii) the time lapse between the fight and the murder; (iii) the retrieval of a gun a quarter mile away; (iv) the "point-blank" execution of Moorer; and (v) Walters's actions after the shooting to dispose of the gun and evade detection. (Sent. Tr. 16–17). The Court also found that because Walters had admitted to virtually all the facts in the case and went to trial to determine his mental state alone, he was entitled to a two-point downward adjustment for acceptance of responsibility. (Sent. Tr. 18–19). The resulting Guidelines range was 324 to 405 months' imprisonment.

After hearing from the parties, the Court considered the factors set forth in 18 U.S.C. § 3553(a). With respect to the nature and circumstances of the offense, the Court "concluded that Mr. Walters' murder of Mr. Moorer was a callous and deliberate, execution-style murder, and done so with premeditation."  (Sent. Tr. 46). The Court stated that "the law must punish Mr. Walters severely. Failure to do so will only allow a continuation of the violence and lawlessness and trauma that Mr. Walters himself has experienced throughout his life." (Sent. Tr. 47). The Court also took into account Walters's remorsefulness, acceptance of responsibility, minimal

criminal history, and difficult upbringing when deciding an appropriate sentence. (Sent Tr. 47-48). The Court remained "convinced that a serious and severe sentence is both warranted and necessary" and imposed a below-Guidelines sentence of 300 months' imprisonment. (Sent Tr. 49-50.)

### F.        Petition

A year after his conviction and sentence were affirmed by the Second Circuit and his petition for a writ of certiorari was denied by the Supreme Court, *see United States v. Walters*, 775 Fed. App'x 25 (2d Cir. 2019), *cert denied* 140 S. Ct. 668 (2019), Walters filed a motion to vacate his sentence pursuant to 28 U.S.C. § 2255 due to alleged ineffective assistance of counsel. (ECF Nos. 116–19.) In the Petition, Walters acknowledges that his attorney's decision to proceed to a bench trial in which the only contested issue was his mental state with respect to the killing was "likely the best strategy given the difficult circumstances of the case." (ECF No. 117 at 6). He further acknowledges that "the forensic psychologist retained by the defense [Dr. Pearson] thoroughly assessed Mr. Walters' background, psychiatric history and mental status as of the time of the report." (ECF No. 117 at 6–7). Nevertheless, he claims, his counsel was ineffective in engaging and presenting expert testimony in his defense. (ECF No. 117 at 20–30). Walters argues this purported ineffective assistance caused the Court to erroneously calculate the Guidelines sentencing range using references to first-degree murder, rather than the second-degree murder. This, he argues, resulted in a sentence in excess of what he would have received otherwise, and he asks to the Court to find his Sixth Amendment right to effective assistance of counsel was violated, vacate his below-Guidelines sentence, and reopen the sentencing proceedings.

**ARGUMENT**

I.     **Walters Has Not Established a Valid Claim of Ineffective Assistance of Counsel**

  A.     **Legal Standard**

To evaluate a claim of ineffective assistance of counsel, courts use the framework established in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail, a defendant must first show that his attorney's performance fell below "an objective standard of reasonableness" under "prevailing professional norms." *Id.* at 687-88. He must also "affirmatively approve prejudice." *Id.* at 693. Only if both elements are satisfied can the petitioner demonstrate that his "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687.

Under the first prong of the *Strickland* test, courts apply a "strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight." *Bell v. Cone*, 535 U.S. 685, 702 (2002) (internal quotation marks omitted). "[T]here are countless ways to provide effective assistance in any given case," and the "central concern" of the *Strickland* inquiry "is not with grading counsel's performance," but instead with ensuring that there has been no "breakdown in the adversarial process." *United States v. Aguirre*, 912 F.2d 555, 560-61 (2d Cir. 1990) (internal quotation marks and citations omitted).

When it comes to decisions about trial strategy involving expert witnesses, courts are clear that issues involving expert witnesses, including "[h]ow to cross-examine an expert witness and whether to obtain one's own expert are 'paradigmatic' strategic choices traditionally reserved to trial counsel." *Parrilla v. United States*, No. 13-CR-360 (AJN), 2021 WL 4066021, at *11 (S.D.N.Y. Sept. 7, 2021) (quoting *Hinton v. Alabama*, 571 U.S. 263, 274–75 (2014) (per curiam)). The Supreme Court has been explicit that an attorney's "selection of an expert witness

is . . .'virtually unchallengeable'" on habeas review. *Hinton*, 571 U.S. at 275 (quoting *Strickland,* 466 U.S., at 690) (alterations omitted).

If a defendant is able to establish his attorney's representation fellow below an objectively reasonable standard, he still must meet the heavy burden of affirmatively proving prejudice. To do so, the defendant "must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding,'" *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland*, 466 U.S. at 693), as "not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Strickland*, 466 U.S. at 693. The likelihood of a different result must be substantial, not just conceivable. *Harrington*, 562 U.S. at 112.

**B.        Discussion**

*i.        Performance*

Walters contests decisions by his attorney regarding the presentation of expert testimony at trial that are "virtually unchallengeable." *Hinton*, 571 U.S. at 275 (quoting Strickland, 466 U.S. at 690.); *see also Parrilla*, 2021 WL 4066021, at * 7. Beyond being functionally immune from second-guessing, the decisions by Walters's attorney here were sound strategic choices, reasonably calculated—though ultimately not enough to overcome the overwhelming evidence of intent—to result in a manslaughter conviction. His attorney hired a qualified forensic psychologist as an expert who provided a favorable diagnosis of PTSD. His attorney then structured Walters's defense around the PTSD diagnosis, arguing that it made his killing of Moorer one committed without malice because he (i) killed Moorer in the heat of passion, or (ii) sincerely, if unreasonably, believed if he did not kill Moorer, Moorer would kill him first. In

support of the second theory, Dr. Pearson went so far as to state the ultimate conclusion that "Mr. Walters'[s] history of PTSD in combination with the situational factors present during the altercation with Mr. Moorer contributed to Mr. Walters' perception that he was at risk for severe injury or death at the hands of Mr. Moorer." (Addendum 1–2). This was a defense designed and calculated to avoid a murder conviction; that it was ultimately unsuccessful does not make it unreasonable or Walters's attorney ineffective.

Walters argues that his attorney was ineffective because Dr. Pearson was unable to persuasively opine about his state of mind at the time he killed Moorer. (ECF No. 117 at 16). Dr. Pearson's Addendum to her report and testimony both made clear that it was Dr. Pearson's expert opinion that when Walters shot and killed Moorer, Walters sincerely feared for his life. She offered direct testimony about his mental state, the only issue disputed at trial. The Court rejected Dr. Pearson's conclusion that the killing was committed without malice and in the heat of passion or as an act of self-defense, not because Dr. Pearson was not a qualified expert, nor because defense counsel had failed to investigate and develop a viable defense, but because Dr. Pearson's conclusion was contradicted by nearly every available piece of evidence. What Walters's current argument boils down to is that his attorney was ineffective because Dr. Pearson's favorable conclusions about his mental state could not overcome the mountain of evidence contradicting them. This is not a viable claim of ineffective assistance of counsel.

Walters also makes a related allegation that his attorney "seemingly failed to relay to the defense expert statements made by Mr. Walters that were plainly relevant to the question of premeditation." (ECF No. 117 at 29). Specifically, Walters alleges that on September 7, 2016 he told defense mitigation specialist Lisa Orloff, a social worker, that while he was shooting Moorer

he was "in a trance," which he claims was not conveyed to Dr. Pearson. (ECF Nos. 117 at 24; 119 at 5).

Walters's claim that his statement to Ms. Orloff was not conveyed to Dr. Pearson for use in her analysis of the defendant falls well short of the defective performance prong of *Strickland*. To begin, the defendant's evidence that Dr. Pearson was unaware of what the defendant told Ms. Orloff about the shooting is speculative and weak. In preparing the Petition, the defendant and his counsel clearly communicated with Ms. Orloff about her interactions with the defendant, yet the defendant provides no evidence, in the form of an affidavit or otherwise, that Ms. Orloff's notes or her descriptions of her conversations with the defendant were not shared with Dr. Pearson. In fact, the best reading of the notes themselves and of the record in the case suggests that Ms. Orloff worked closely together with Dr. Pearson and defense counsel on this case and that Ms. Orloff's notes, or at a minimum their substance, were shared with Dr. Pearson before she created her report and testified.

Lisa Orloff was a mitigation specialist hired by defense counsel. (*See* ECF No. 93 at 5). According to the report she prepared and submitted to Probation and the Court in advance of sentencing, Ms. Orloff met with the defendant numerous times, lasting cumulatively 30 hours, between August 2016 and July 2017. Her report indicated she was present during at least some of the trial, and defense counsel also noted Ms. Orloff's appearance on the record at sentencing (Sent. Tr. 2). Ms. Orloff prepared notes following her meetings with the defendant. These notes are written to defense counsel directly and indicate that Ms. Orloff worked in tandem with defense counsel and Dr. Pearson. For example, in the notes from her fourth interview with the defendant, which happened on September 26, 2016, Ms. Orloff wrote the following to defense

counsel about the defendant's diagnosis at MCC with Intermittent Explosive Disorder. The item

is highlighted in the original copy of the notes filed by the defendant with the Petition:

> We'll discuss this at our meeting, Paula [defense counsel], there are
> some good and bad things in here…what was JW's perceived
> provocation with Bully? It was unpremeditated, etc…We should ask
> Jessica [Dr. Pearson] about this: is it possible to come to a diagnosis
> merely based on historic childhood behavior? Should she see JW to
> assess him for IED?

(ECF 119 at 910) (ellipses in original). From this passage, it is clear that Ms. Orloff and defense

counsel had a close working relationship that involved them providing information from Ms.

Orloff's sessions with the defendant to Dr. Pearson in hopes that Dr. Pearson would use the

information to provide favorable conclusions for the defense, including that the murder was

"unpremeditated."

Ms. Orloff's working relationship with Dr. Pearson also involved preparing the defendant

for his meetings with Dr. Pearson and following up with him afterwards. On September 7, 2016,

Ms. Orloff's notes from meeting with the defendant indicate that she explained "Dr. Pearson's

role [to the defendant] and let JW know Dr. Pearson would interview him" the following week.

(ECF No. 119 at 2) (redacted in defense filing). During her September 26, 2016 meeting with the

defendant, Ms. Orloff followed up with him about that meeting with Dr. Pearson and discussed

his meeting with defense counsel as well. (ECF No. 119 at 8) (partially redacted in defense

filing). Given the nature of the working relationship between Ms. Orloff, Dr. Pearson, and

defense counsel that is reflected in Ms. Orloff's notes, the defendant's speculation that the

substance Ms. Orloff's conversations with the defendant were not shared with Dr. Pearson is not

credible.

It further strains credulity to believe Ms. Orloff's notes were not shared with the

defendant's expert, Dr. Pearson, because the record indicates that they were shared, at least in

part, with the Government's expert, Dr. Paradis. During direct examination, Dr. Paradis

discussed her inability to interview the defendant's girlfriend. She noted that instead of speaking

to the girlfriend directly she had notes of an interview done by Dr. Pearson, and she thought

"notes from a mitigation specialist as well." (Tr. 126).

Whether Ms. Orloff's notes were shared with Dr. Pearson ultimately does not impact the

analysis whether defense counsel's performance was deficient. Analysis under this prong of

*Strickland* begins with the "strong presumption that counsel's conduct falls within the wide

range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Although the best

evidence is that Ms. Orloff's notes were shared with Dr. Pearson, had defense counsel decided

not to share the notes, that too would have been a reasonable decision. The statement Walters

made to Ms. Orloff that he was "in a trance" when he killed Moorer was a part of a broader

inculpatory statement he made that supports the conclusion that he committed a premeditated

murder. His complete statement to Ms. Orloff, as reflected in her notes is below.

> You know on the news when you see someone stab someone 40
> times it's like a rage? [JW acted this out with his arm like he was
> holding a knife] Well it was like that, I fired 5 shots. I still don't
> know why I kept on after 1 or 2. It went 'boom boom boom boom
> boom [he said this onomatopoeia very very quietly]. It was like my
> finger was stuck on the trigger. It was the first time I shot a gun. I
> was never at a firing range. I was stunned. I felt like I was in a trance.
> I had to snap out of it.
>
> I ran to my bike. I rode as fast as I could thinking: now you go to
> jail. You would've been shot now you became someone who shot. I
> felt death was near. I wanted to take myself off the street. I thought
> about killing myself, shooting myself in the head but I had no more
> bullets; there were only five. It was the most traumatic day of my
> life.
>
> [JW "snapped out of" his absence and returned to the present
> moment and continued,] I felt like I rolled down the hill, into a
> swamp, into a gator's mouth [his eye contact returned and he smiled
> and laughed a bit]. My life was in shambles. Before I turned myself
> in, for those two weeks I was lost. I felt like an alien, like I was from

somewhere else. And then I turned myself in. It was hard to accept reality.

I know I need time. I still would turn myself in. Murder is always heinous. Murder and terrorism. I regret it. I couldn't help or restrain myself. I was shaking. I felt like in a way I'm not right, In a way I'm not wrong.

I'm sorry. I will never forgive myself. I took someone's life. He threatened to take my life. I never should've grabbed my gun. It was bad. I should've handled it differently.

(ECF No. 119 at 56).

Walters told Ms. Orloff that he acted as if in "a rage" when he killed Moorer. He described the killing as "murder" and acknowledged making a choice, albeit one he later regretted, when he went after the fistfight to "grab[] my gun." This was strong evidence of intent. And even if credited and interpreted literally, his statement that he was "in a trance" applies, not to the first two point-blank shots at the unarmed Moorer, but to the next three. Walters functionally admitted to the defense mitigation specialist that his first "1 or 2" shots at Moorer were planned and deliberate, which confirmed that Walters acted with malice and premeditation when he pulled out the gun and started shooting at Moorer. Walters also described the immediate aftermath of the shooting and his attempt to escape on his bicycle, evidence that, despite his statement in hindsight that he had been "in a trance," he was conscious and present in the moment, even if he was immediately regretful of the murder he committed. Walters's broader statement to Ms. Orloff does more to prove his guilt than to exonerate him, and it was a statement that his attorney could reasonably keep from a psychologist that the attorney hoped would reach a conclusion that the killing was an act of perceived self-defense and was not premeditated.

In his final claim, Walters faults his attorney for not getting new, and different, expert testimony after the trial and before sentencing. (ECF No. 117 at 26). If the decision "whether to

19

obtain one's own expert [is a] 'paradigmatic' strategic choice[] traditionally reserved to trial counsel," then surely the decision to hire a second expert after trial is a strategic choice committed to counsel's discretion as well. *Parilla*, 2021 WL 4066021, at * 11 (quoting *Hinton*, 571 U.S. at 275).

ii.  *Prejudice*

Even if Walters could show that his attorney's performance was deficient, he still could not establish a successful claim of ineffective assistance of counsel. The evidence that Walters murdered Moorer in a premeditated shooting was overwhelming, and there is no "reasonable probability" that the alleged errors of his attorney impacted the verdict or sentence in this case. *Strickland*, 466 U.S. at 694.

More than six minutes after his fistfight with Moorer over a $10 bag of marijuana ended, Walters returned to the scene of the fight and gunned down Moorer on the sidewalk in an execution style shooting. In the intervening six minutes, Walters had (i) biked a quarter mile from the scene of the fight, (ii) retrieved a gun from a hiding spot on the roof of a building, (iii) biked back to Moorer's location, (iv) biked off the sidewalk and into the street, out of Moorer's view, and (v) reappeared on the sidewalk with a gun in hand. Then, in rapid succession, and at point-blank range, Walters fired five shots into Moorer, including after Moorer had fallen to the sidewalk and writhed in pain. Walters then wiped his fingerprints from a car, left the area calmly, and disposed of his gun and his bicycle. Walters's actions, and principally the sequence of events that occurred between the fight and the final gunshot, demonstrated beyond a reasonable doubt that Walters acted with malice aforethought and murdered Moorer.

Walters tacitly concedes that there is no reasonable chance that any different trial strategy or expert testimony could have affected the Court's finding that he committed a murder, that is that he acted with malice aforethought when he killed Moorer, and accordingly Walters does not challenge his conviction. (*See* ECF No. 117 at 2, 25). Instead, he argues that he was prejudiced because his attorney's alleged deficiencies caused the Court to find that he had committed a premeditated, first degree murder, rather a non-premeditated, second degree murder. He therefore challenges only the sentence that he received, which was based on the Court's finding the murder was premeditated and subsequent Guidelines calculation. But under the facts of the case, once you accept, as the defendant now does, that he acted with malice and intended to kill or seriously injure Moorer (or that he acted with a depraved heart), the conclusion that the murder was premeditated is inescapable. This is especially true considering the different burdens of proof applicable to each issue: the Government was required to prove malice beyond a reasonable doubt but premeditation by only a preponderance of the evidence. *See United States v. Vaughn*, 430 F.3d 518, 525 (2d Cir. 2005); Sent Tr. 14.

As noted by the Court at sentencing, the same facts described above that proved beyond a reasonable doubt that the killing was a murder, also proved by at least a preponderance of the evidence that the murder was premeditated. (Sent. Tr. 14–18). After the fight with Moorer, Walters left the scene for six minutes, only to reappear later with a gun to kill Moorer. As the Court described it when stating its finding that the murder was premeditated:

> Six minutes is a long time. And certainly, under the circumstances and as the evidence establishes, a sufficient period of time by which Mr. Walters could have cooled off, had a variety of choices with respect to escape and safety.
>
> Instead, Mr. Walters rode his bike, retrieved a hidden gun, returned back to the exact scene of the fight where Mr. Moorer was. He rode the bike between two cars and onto the street so that he could attack Mr. Moorer, who was unarmed and talking on his cell phone.

> Mr. Walters pulled out his weapon, approached Mr. Moorer, and he executed him. He fired at least -- as the video shows at least, we know, five shots at Mr. Moorer at point-blank range, including at least two shots after Mr. Moorer was on the ground and in obvious pain.

(Sent. Tr. 16–17).

The evidence that Walters murdered Moorer, and that the murder was premeditated, was overwhelming. Any additional expert testimony put forth purporting to show the murder was spontaneous and not premeditated would have been noncredible and not impacted the Guidelines calculation or the sentence Walters received.

## II.     A Hearing Is Not Required and No Certificate of Appealability Should Issue

The filing of a Section 2255 petition does not, by itself, obligate the district court to conduct an evidentiary proceeding. *Newfield v. United States*, 565 F.2d 203, 207 (2d Cir. 1977) ("The motion does not entitle petitioner automatically to a hearing."). Rather, a district court may dismiss a Section 2255 petition without a hearing where the defendant fails to raise "detailed and controverted issues of fact." *Id.* Similarly, where the existing record "conclusively show[s] that the [petitioner] is entitled to no relief," summary dismissal without a hearing may be appropriate. *Id.* (quoting *Dalli v. United States*, 491 F.2d 758, 760 (2d Cir. 1974)); *see also* 28 U.S.C. § 2255(b) (stating that the Court shall grant a hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief") Because, as described in detail above, the existing record conclusively shows that Walters is not entitled to the requested relief, summary dismissal without a hearing is appropriate in this case.

Similarly, Walters has failed to make a substantial showing of the denial of a constitutional right, and the Court should decline to issue a certificate of appealability. *See* 28 U.S.C. § 2253(c).

## <u>CONCLUSION</u>

For the foregoing reasons, the Government respectfully requests that the Court deny the

Petition without a hearing and decline to issue a certificate of appealability.


Dated: New York, New York
      October 18, 2021

                    Respectfully submitted,

                    DAMIAN WILLIAMS
                    United States Attorney for
                    the Southern District of New York


By:                  _____

                    Andrew Jones
                    Assistant United States Attorney
                    (212) 637-2249